Good morning, Your Honors. My name is Karen Bucher, and I represent the appellant Tyra Goodman. This is the case where the defendant started a business while she was on supervised release and helped get her business off the ground. She took out a loan from a private individual, and the only question in this appeal is whether her conduct of taking out this private loan violated her conditions of supervised release. I couldn't understand the argument. If I understand it, the condition is you can't have a business for soliciting funds. And her theory is that this wasn't a telemarketing type business where you solicit funds. But as far as I can tell, the only business of her business was soliciting funds. She was just asking people to invest money in this imaginary business that never did any business and never got close to doing any business. It was just getting people to give her money. Actually, she did have one client who did sign up. But what my argument is is only limited to Allegation 1. And Allegation 1 says she violated her terms of supervised release by entering into this contract for funds to start up the business. That's what my point of this appeal is. The language of the condition is solicitation of funds or cold calls to customers. Now, she did solicit funds in order to start the business, and the district court thought that was enough. Is that a clearly erroneous interpretation of the condition? Yes, because if you read Allegation 1, it just simply states she violated her terms of supervised release by entering into this contract with Donna Smith. That is the scope of this allegation, and that's what my argument is limited to the scope of Allegation 1, which states she solicited funds by entering into this agreement, this private contract with an investor. Counsel, the condition says it prohibits engaging in a business involving the solicitation of funds, right? Yes, it does. Okay. So any business that would include the solicitation of funds for any reason would clearly be within that. But that's not how the allegation was framed, how it was framed, that the solicitation of funds was not the conduct of the business itself. It was the fact that she entered into an agreement for funds to start up her business. That is the limited scope of my argument. What other business was there? I'm sorry? What other business was there? The business itself is something separate from the argument. The business was an office management company where small businesses could sign up and their business could be managed through online banking. But she never did any of that, did she? She did get one contract. But if that business, regardless of what it was, involved the solicitation of funds, then it violated the condition. But that's not how the allegation was alleged. See, there was eight allegations. The second allegation involved the checks that were deposited that eventually bounced. My question or my argument is very, very focused on the very first allegation that says she violated her terms of release, conditions of release, by entering this contract. Because it involved the solicitation of funds. The contract involved the solicitation of funds. That's what the prohibition was, that she not engage in a business involving the solicitation of funds. So if she engaged in a business that involved the solicitation of funds, it violated the condition. I don't understand what's wrong with that interpretation. My reading of the allegation by itself, they weren't alleging that she was in a business soliciting funds. It alleged that she violated her condition by entering a contract that involved funds to get her business going. That's exactly right, because it says business involving the solicitation of funds. And I don't believe that a private contract between two individuals is the solicitation of funds. It didn't say is the solicitation of funds. It said involved the solicitation of funds. I guess your argument is that she borrowed the funds to start a business that did not involve the solicitation of funds. Her business was to set up websites for people, handle their online banking and taxes, and act as a personal valet. Now, the district court judge thought the condition ambiguous enough to pick up what she did, which was to borrow funds to start the business. And I guess what we have to decide is whether his interpretation was clearly erroneous. And I think there's perhaps enough ambiguity here that we couldn't decide that he was unreasonable. That's what you're arguing against, I think. Right, Your Honor. I just – I believe the solicitation of funds is more like telemarketing, cold calls, getting money for something. What she did in entering this contract was obtain funds to start a business that she was going to repay. It's something very, very different. Counsel, what are you – how do you define involving? If it says business involving the solicitation of funds, how do you define that term involving? That would mean to me when you have a telemarketing company where you're going out getting funds to purchase items. She was offering a service. If the judge just wanted to prohibit telemarketing, could have done it. In fact, as I recall, he did do it, but then he used this broader catch-all language. You mean in the terms itself? Right. It was – involved loan programs? It looks like he's saying if he put it in just the plainest English, don't ask people for money. If you ask people for money, I'm sending you back to jail because you already stole. I don't remember if it was $400,000 or $600,000. Good con artists. So don't ask people for money. In the business. That's the way I read the catch-all provision. My distinction is something separate, that this was a contract to start her business. It's different than running the business itself, and that's the basis of my argument. And did – and then this business where she stiffed the – the way you would see it, she started a real business that was for being a valet service or something, and she stiffed a creditor that had invested in it, but that's different from a business to explicit funds. Did she act as a personal valet for somebody? It's different. I don't think she meant to stiff the investor. Whether she meant to or not, was there ever anyone that she acted as a valet for? Yes. There was one individual, Mr. Johnson. He did give her money to – as a client. The record doesn't tell us what had happened. I thought it did. I thought she never acted as a personal valet for anyone. I don't remember that in the record. If there's no further questions, I reserve the remaining time for rebuttal.  Thank you. Thank you. Good morning. May it please the Court. My name is Jeremy Matz. I represent the government in this appeal. This Court should affirm the judgment of the District Court because the District Court did not plainly err or abuse its discretion in finding that the defendant had engaged in a business that involved the solicitation of funds in violation of that condition of her supervised release. Counsel, did the District Court find that condition to be ambiguous at all? No, Your Honor. I believe the District Court did not make any such findings. As Your Honor stated in his questions just a moment ago, I believe that the precise danger that the District Court was trying to prevent and to avoid in this particular case was to make sure that this defendant did not ask people for money anymore. That was exactly the nature of the underlying criminal conduct that she engaged in for which she was sentenced and placed on supervised release. And, in fact, the District Court, when reimposing the 12-month sentence for violations of supervised release after this Court's remand from the first appeal, found that the 12-month sentence was warranted because, quote, the defendant was doing exactly the same thing that she was doing before she was placed on supervised release and for which she was placed on supervised release. That finding is located at pages 27 and 28 of the defendant's excerpts of record. Your Honors, the evidence was clear, as presented at the evidentiary hearing, that, first, the defendant engaged in a business. That business was vast office management. The evidence showed that the defendant came up with the idea for that business, proposed that idea to Ms. Donna Smith, the defendant created the business plan for VAST, and the defendant got Donna Smith to obtain a DBA for VAST office management precisely because the defendant did not want her name associated with the company, did not want the government essentially getting into her business. The District Court, in finding the defendant to be in violation, essentially found that the defendant had engaged in and operated VAST, and that is a fact to find and clearly supported by the evidence. Was there a client, incidentally? I think it was some kind of personal valet business. That is the alleged nature of the business, I believe, Your Honor. Was there somebody that she actually did work for as a personal valet? I don't remember any such client, and I don't remember anything in the record discussing any such client. If my memory serves, Your Honor, the defendant did not herself testify at the evidentiary hearing. I don't believe Ms. Smith did testify. I didn't actually understand it, and I was wondering if there was some testimony. The hotel I used to stay at had a personal valet button. You press a button, and they take your laundry to be done or your shoes to be shined or whatever it is. I suppose that's what personal valets do. I don't know. I couldn't understand the business. I couldn't see how they could take your shoes to be shined by e-mail. Well, I had, I guess, what you would call a personal valet who, when our children were younger, came in and would run the errands and take them to their ball games and bring the groceries in and organize the cleaning staff. So there is a genuine service out there that is rendered. No, we don't get that in Fairbanks. The S.O.L. companies had it, expediters they called them. Your Honor, the most I can say on this issue probably is that far be it for me to describe or inform the Court exactly what the nature of this particular defendant's. Was there a record showing what the nature of this particular defendant's activities were for any customer of this supposed business? The only record on that issue, Your Honor, would be Ms. Smith's testimony at the evidentiary hearing and the contract itself. Where do we look? The Court would look at Ms. Smith's testimony in the record, which begins at page 43 of the defendant's excerpts of record. And what did she do? I'm sorry? What did she do? What did the defendant do? Yeah, what was the business? Your Honor, as described by Ms. Smith, the best Ms. Smith understood it, and I believe that was somewhat unclear even to her, but I believe that the nature, alleged nature of this business was to not provide services of the type that the Court just described a moment ago exactly, but more financial-type services, especially online banking perhaps. She said online banking and taxes, but separately as a personal valet? I suppose so. That's what she said. I think that's right. I think that, as the Court has already picked up on, this business never really got any farther than simply the solicitation of the $7,500 by the defendant from Ms. Smith. Ms. Booker mentioned one particular client. I don't remember anything in the record about any particular client, but even that being the case, it's clear that the defendant took the $7,500 from Ms. Smith and paid back only about $70 of it. So as found by the District Court, the defendant not only engaged in this business, but solicited funds in order to do so. And in that sense, the business, that being Bass, clearly did involve the solicitation of funds. That was the solicitation of the $7,500 by defendant from Ms. Smith. Unless the Court has further questions, I would be prepared to submit. Thank you, counsel. Thank you, Your Honor. Ms. Smith described the proposed business as a virtual reality personal assistant business where the company can do everything from creating a website to any type of personal valet for small businesses such as online banking, handling taxes, or even negotiating contracts. And that's found at ER 50. Counsel, where in the record is the reference to a specific client who was served by the business? That was where it's going to go next, Your Honor. On January 2006, Ms. Smith testified. The client didn't testify. Ms. Goodman didn't testify. But Ms. Smith testified. Give us the ER. For the client? The testimony that you're talking about. I just want to follow it and mark it up for you. The testimony that I just described regarding the description is found at ER 50. Yeah, I got that. But now you're about to give some new testimony you're going to describe, and I just want to follow it as you say it. Yes, it's ER 66 through 68 where Ms. Smith said that her godbrother, as she describes him, Cephas Johnson, was the client. They went to Oceanside to visit him, and he's a contractor. And Mr. Johnson agreed to use the services of this company and actually wrote out a check for $10,000. And Ms. Smith testified that the work for Mr. Johnson was completed. That's at ER 80. The record is unclear as to more than that of any further description exactly what happened or any more about the business and the client. He wrote a check for $10,000 to hire them, and then what happened? Page 68 said he wrote us a check for $10,000 to hire them. Yes, sir. And did what happen after that? I think nothing as far as the record is concerned. The record doesn't tell us what happened. On cross, Ms. Smith said, well, defense counsel asked, now this is on ER 80, line 5. Now for the money that was received for Mr. Johnson, work was done, correct? Answer, as far as I know, I didn't see any of the completed work. But according to the business plan, yes, I know the work was completed. So the record shows this was a viable company. Well, she said according to the business plan, I know that was completed, the business plan, not the work. The business plan was completed. The way that I interpret this, something was done for Mr. Johnson, but it doesn't tell us what it was. I'm not sure it was. It sounded like he was medically impaired and couldn't pursue some deadbeats, and so he hired her to do it. And I don't see where it shows that she actually did anything. You're right, Your Honor. The record does not go into that part of the case of what happened, what she actually did for Mr. Johnson. Thank you, counsel. Thank you, Your Honor. United States v. Goodman is submitted.
judges: Fletcher, Kleinfeld, Rawlinson